Case 14-1063, Louisiana Public Service Commission, Petitioner, the Federal Energy Regulatory Commission. Mr. Bonfin for the petitioner, Ms. Perry for the respondent, Mr. Knob for the intervener. Good morning. Good morning. May it please the Court. My name is Mike Fontham. I represent the Louisiana Public Service Commission. In this case, FERC held on June 1, 2005, that the energy system agreement rates were unduly discriminatory. There was no remedy until June 1, 2007. On remand, this Court, well, when the case was appealed to this Court, the Court overruled the delay. And on page 383 of the decision, it said, we grant the petition with respect to the Commission's decision to deny refunds and to implement a prospective remedy commencing in 2007 based on 2006 data. But on remand, FERC corrected only seven months of the two-year delay, leaving basically 17 months in place. What I'd like to do is I'd like to trace quickly, hopefully, the origins of the rationale that the Court is seeing this time. And then I will respond to the other arguments that the respondent and the interveners are making. But I think it's important to note that FERC did, in Opinion 480, say that it was going to make the remedy effective in 2006. But it changed that. In Opinion 480A, it said, the remedy will be implemented on a prospective basis after a calendar year of data becomes available. This Court reversed the decision to implement a remedy on a prospective basis commencing in 2007 and remanded. When the case went back to FERC, I guess there's a huge difference in how everyone interprets that opinion. But did we reverse it and say that that's not appropriate, that that can't be done, or did we say there needed to be a better explanation? I think it's a remand in which there could have been conceivably some better explanation. Then you're in big trouble. I don't believe that we are in trouble. Because what FERC says on remand and what they say in their briefing before us is that just because this disparity is recognized as effective on, I guess it's June 1st of 2005, that disparity then needs to be remedied as of that time. But that's different than saying that a remedy has to be in place as of that date for disparities that occurred prior to that date, which is your argument. No, Your Honor. We never said that, and we don't say that. We said that a remedy, a formula, Judge Rogers has written a decision on how rate formulas work. A formula should be put in place commencing June 1, 2005. That establishes the rate. The data is not the rate. The data can come from 2004. It can come from estimates. It can come from any number of places. But the formula should go into effect in 2005. You can look in the joint appendix at how they put the system agreement in in 1983. And it starts on page 444. In 1983, the rate started based on 1981 data. Then on June 1, 1982 data went into the formula. Every FERC formula rate, everybody gets their money right away. But it's based on the previous. But this remedy is remedying a disparity, and you don't know that there's going to be this unwarranted, undue discriminatory disparity until after the disparity occurs, right? No. In Opinion 480, FERC said it's not going to go away. The disparities are going to continue.  Energy made filings with FERC that said the disparities are going to continue. And that is not FERC's rationale, that we have to wait to see if a disparity occurs. What FERC did was it went back to Opinion 480, and it acted like it was giving refunds, that the 2007 payment is a refund for 2006, and the 2008 payment is a refund for 2007. That's what a payment would be. If you had a payment in 2007 to remedy 2006, that's a refund. FERC has said multiple times the bandwidth tariff does not involve refunds. Both of the compliance orders say that. You can look at page 168 of the appendix. So if FERC were to do or we were to order FERC or FERC were to decide on its own to do what you're saying on June 2nd of 2005, what remedy, what time period are they remedying? They're remedying going forward. What you do in setting rates is you set rates. They're not remedying the disparity that is occurring on June 2nd, 2005? Yes, sir. They're not remedying a disparity that occurred prior to that? No, sir, not unless they say we're going to give a refund for 2004. So if they're remedying an error, so you agree then that pursuant to Order 480, opinion 480, FERC's responsibility is to correct errors as of June 1st, 2005? Yes, sir. Not errors, not disparities that occur prior to that? Oh, no, no. But we did say because on June 1st, 2005, how did they set the rate that was unduly discriminatory? Data from 2004. The unduly discriminatory data was from the prior year setting a rate on June 1st, 2005. We said do it the way you've always done it with the system agreement, the exact same way. What you do in rate making is you say we have to estimate what the rates need to be going forward. The normal way to do that is to use a prior recent period, which is deemed to be representative of what the rates would be going forward. In rate making, this is everywhere. In rate making, the utility can say, well, there's going to be a known and measurable change, so we can adjust to that if they want. But FERC, when it has set these formula rates, and I was in the case where the Fifth Circuit approved this, they said, well, the benefit of this is they're going to use actual data from the prior year to set the rate going forward. This rate, this system agreement, in 1983, on January 1st, when it was made effective, nobody waited for a year to send a bill or two, and FERC has formula rates for almost every, probably the majority of utilities in the country. Nobody waits a year. But this was created to solve a specific problem, which was unwarranted disparities. What if there was no disparities in 2004? Everybody's production costs were completely at fault. If there was no disparities, they would have put in the 2000, used 2004 data. I'll promise you that. But the idea of it is you're setting a rate going forward, and the use of the formula data I'm not sure I understood your answer to my question. I'm sorry, Your Honor. If there were no disparities in 2004. There would be no payment. But it would simply be saying 2005. So it would be irrelevant that there was a disparity from June 1st, 2005, through the end. Well, that is correct, if the 2004 data was used. And that would be because. That's not the way that the formula works. Your Honor, this is important. The formula is not before us. The formula has been approved. The Fifth Circuit and others have. I mean, we've approved, and the Fifth Circuit has approved it. Yes, Your Honor. And, you know, what they actually. Well, you haven't approved the bandwidth formula. Because the bandwidth formula was just inserted into this rate. But I need to make this very clear, Your Honor. The fact that this has been held many, many, many times. The fact that you're using past data to set the rate. And all rates commence immediately to cause bills to be sent. That does not mean you're setting anything for the prior year. You're setting it for this year going forward. Using representative data to set what you think will be needed in the future year. And, you know, Service Schedule MSS 1. Service Schedule MSS 1. It works the same way, only it doesn't accomplish the elimination of undue discrimination. You don't know what the loads are going to be next year. But they use the past year's loads. I understand that completely. But I guess I think that only gets you so far. Well, it gets you this far. What utility has ever, using a formula rate based on past year. What utility has ever waited two years? There is none. Nowhere in the United States has that ever happened. What time has Burke ever said to anybody else except the LPSC, we're going to wait for a year of data to be accumulated and then we'll start your remit. And this argument that the 2007 was for 2006, what is that? That's a refund. A payment in 2007 to correct a disparity in 2006 is a refund. FERC is saying it's not a refund. It's essentially an insurance policy. Well, they don't have that in their rationale. And really, FERC didn't say that in the brief. The interveners did. But they have one time in Opinion 480 where they used the term insurance policy. And it was responding to Energy's argument that their resource plan was going to solve the problem. And FERC said, well, if it does, there won't be any payments. But you don't, the Federal Power Act doesn't say establish an insurance policy. And, you know, I had an insurance policy on my home when Katrina hit. The insurance company paid me off at the time of the loss, not two years later. That's, you know, you can't, and let me make another point if I could because I'm getting a little discombobulated. You've got good insurance then. I had good insurance. They came out and they looked at it. Just because they wait two years doesn't mean it's not still insurance. Well, but if they waited two years, they would have a lawsuit against them and they'd have to pay interest. And, you know, this whole. Well, that's a separate question. Well, it's. That's still, you could still get your interest, right? We can't. Well, let's look at it. The bandwidth formula went in in 2007. It wasn't the one adopted for 2006. It was a new one. Energy changed it. They took $30 million away from us. It became effective May 30th, 2007. That it says on, you can look at in the joint appendix, 867 to 876. The pages that are the formula rate that were inserted into the tariff as of then contained amendments. And at the bottom of each page, it says effective May 30th, 2007. When FERC approved their first payments, it said these are effective June 1st, 2007. It didn't say they're effective in 2006. And when we asked for interest in both compliance orders, FERC said these payments are not refunds. They're prospective. Just like other FERC formulas. They started the rate in 2007. And the court said they implemented a prospective remedy commencing in 2007 based on 2006 data. But if it's a refund under FERC policy, you pay interest. And Energy made its filing and said, well, we don't have to pay interest because this roughly equalizes costs going forward, not backward. And FERC accepted that. This roughly equalizes costs going forward, not backward. So if it's not a refund, FERC has said over and over, it's not a refund. The bandwidth tariff does not involve refunds. Joint appendix 168, the compliance order, paragraph 51. Joint appendix 314, the reading hearing order, paragraph 32. Their arguments to not provide interest, it is not a remedy for the prior year. It's a prospective remedy going forward. So on June 1, 2005, they said a remedy is needed. They put in a prospective remedy going forward on June 1, 2007. On the remand, they corrected seven months. They didn't correct 24 months. So we are currently out a remedy. Now, if you went back and you said, okay, FERC, you've got to give interest for that delay between 06 and 07, between 07 and 08, between 08 and 09, between 09 and 10. You know, for all those years when the LPSC was really getting a delayed payment, not a retroactive remedy, you know, that would partially solve the problem. But the insurance policy, you know, on my home, the roof blew off. Would my company be able to change the insurance policy after my roof blew off to not cover roofs? That's what they did in 2007. They added a whole new formula. They decided to put in labor ratios and use their service company labor in those labor ratios. It changed the tariff significantly. And FERC allowed them to put it in, allowed them to make it effective immediately. If we were dealing with a situation where they were providing a remedy for 2006 and 2006 had already occurred, they couldn't do that. That's retroactive rate making. But they could do that in this case because starting June 1, 2007, is when the rate started. And it's when the remedy started. But, I mean, FERC has discretion, despite the, notwithstanding the general prohibition against retroactive rate making, to fashion a remedy in response to correcting... An error that was acknowledged by the court in the litigation over that remedy, right? Your Honor, I don't think FERC has the discretion in 2007 when it is correcting, it is, you know, applying a refund to enforce a rate for 2006 to say, okay, you can now change the terms. That's a violation of the rule against retroactive rate making. And that actually was what they originally said about using 2004, that you can't do that. But the problem with that was that they do do that every day. And in the case that Judge Rogers and Judge Kavanaugh sat on, the interruptible load delay, what did FERC do on remand? They changed the data for the prior year. Because that's what the court told them to do. They had interruptible loads for the previous 12 months. And FERC delayed the remedy by saying, well, we have to wait. And as the interruptible load goes out in the future months, we'll let them take it out. That was Energy's attempt to delay that one. But in that case, you knew at that moment how to take out the interruptible load because that was, you know, had been baked into the formula. So you could excise that. No, you don't know on. You don't know how much is going to be used, but you know what your capacity is. Yes, but it's the load that you don't know. And the load is what they corrected. And what they said was, well, we'll see what the loads are. And then we'll put those loads in to change that way. Whereas for all rate making, what they do is they change the prior data. And the court reversed that. And actually, the court said it doesn't really matter whether you're talking about a deferred billing or you're talking about a prospective tariff. It doesn't really matter. You allowed Energy to charge unduly discriminatory rates after the date of your decision on April 1, 2004. And you cannot do that. Well, in this case now, FERC allowed Energy to continue charging unduly discriminatory rates from June 1, 2005 to June 1, 2007. All of the costs happened. All the rate payers paid up. And there was no remedy. The remedy started June 1, 2007. And I request the court to ask them, what other rate ever did a utility have to wait a year to get its money? Or two? Why don't we hear from counsel? OK, thank you, Your Honor. And we'll hear from you in rebuttal. Probably be good for your ears for now. Good morning. Good morning. I'm Lona Perry for the commission. The commission has been quite clear from the beginning in 480 about how the bandwidth remedy works. And from 480 and going forward and in these orders before the court today, the commission has said that data in one year is accounted for under bandwidth payments in the following year. And those are prospective payments because you have to have the year of data, you have to get the form one, you have to make the calculations, and the payments start as soon as possible thereafter. But you heard counsel. So explain to me, if the agency decided as of 2005 that there was this unlawful disparity, isn't that when a remedy has to be provided? Well, the commission found, Your Honor, that reallocating costs that occurred before June 1st, 2005, would constitute a retroactive remedy, essentially a refund, because there had been no finding prior to June 1st, 2005, that disparities in the production costs were unjust and unreasonable. And so, therefore, beginning with June 1st, 2005, the commission began to look at the disparities in production costs and to provide payments under the bandwidth remedy for those disparities. So in the remand that both sides seek on the refund issue, is that issue open? Yes, Your Honor. And the thing to recall in that regard is that the refund effective period in this case runs from September 2001 to May of 2003. And we discussed this in our brief at pages 32 and 33. So this has nothing to do with whether they get refunds under the statute. This has to do with whether after the refund period, they can then get bandwidth payments for production cost disparities in 2004 and in the first half of 2005. Let me just ask you to deal with the hypothetical for a moment. If the petitioner were to recover the remand, the refunds that it seeks, that would not, this is a question, would that provide the full remedy that the petitioner is seeking in this case? No, Your Honor, it would not. All right, so we're back to where we started. So the commission says in June of 2005, in my language, Louisiana's been paying too much. And normally you know they're paying too much because you look at the rate they've been charged, right? And that rate was set based on the prior year data, estimating what the rate would be in 2005. Right? Your Honor, that is not the way bandwidth remedy works. I understand it isn't, but what I'm getting back to is the decision of the commission under the Federal Power Act that as of June 2005, again in my terms, Louisiana was paying too much. So there had to be adjustments made. So if I'm Louisiana and I'm paying hypothetically, I don't know, $30 million, and that's too much, why do I have to continue to pay in 2005 that $30 million? Because under the bandwidth remedy, what I'm getting is relief arguably for 2006, but not for 2005. And if the whole premise of setting the 2005 rates was looking at the data in 2004, why can't I get a remedy against that $30 million I'm paying for the 2005 period? That's the only question I have. And I looked at the orders, and you can tell me where the best responses are, but I used your brief as a lead in trying to understand that, where you recount what Louisiana's arguments are, and then the commission says, we reject it. And I understand that, but I'm trying to understand why when you get down to what I'll call the hard numbers. I understand the theory of a bandwidth remedy, but I don't understand how that fits with the harm that has been suffered, where they're entitled to relief from that harm. They're entitled to relief from the harm, Your Honor, from production cost disparities that exceed the bandwidth. And this is where the insurance policy point comes in. Okay, but you agree the commission didn't use that. That's Energy's word, right? Not at all, Your Honor. Where did the commission talk about it? The commission said it in 480, paragraph 44, and you're joined appendix at 65. 480A, paragraph 26, and you're joined appendix at 123. Hold on, I'm on page 65. Paragraph 44. I'm looking at it. It's explaining why the fact that they have a plan to try to adjust the production cost disparities by reassigning generation. Right, and it says, in effect, we're accepting Energy's view that this is like an insurance policy. All right? And, I mean, the hypothetical of a private home and a roof goes off and you get paid for it. You don't have to wait until the next roof goes off. But in any event, I just need to understand that in sort of laid terms, because I thought the strongest arguments that the commission made were, for example, in paragraph 37, and then, where's the other one? Paragraph 34. But I don't see the direct response. I mean, you could say that the bandwidth remedy is simply not going to give me any relief for the $30 million I paid in 2005. And if that's the way the commission designs it, that's the way the commission designs it. But as I understand it, that's still open for question. In other words, if the commission can explain it, fine. You may prevail. It may prevail. But that's where I'm having a little problem here. Well, Your Honor, I would like to make the point first that the reason why you're not seeing a direct response to that argument in the commission orders is because it was not raised to the commission on rehearing. And we made this point at pages 37 to 40 of our brief. And if you look at the reply brief filed by the Louisiana Commission at page 26, they essentially admit that they didn't raise it on rehearing, and they have various reasons why they didn't need to do that, which I can go through those reasons and tell you why they don't apply. But that is why you don't see a direct response to that in the commission orders, because it wasn't. For example, if you take the May 2007 order that he was just talking about in his initial arguments, and you look at their rehearing requests, which the argument about implementation is in your joint appendix at 337 to 342, you don't see any mention of that in the rehearing requests. Okay, but even in your own brief, you acknowledge, and Judge Wilkins was talking with counsel about this, that in our 2008 decision, we sent back to the commission this question. Exactly, Your Honor. So it wasn't before the commission. I mean, it's not a surprise. We sent it back to the commission. Well, the commission in the commission responded to, if you look at the arguments that were made on rehearing, what was argued on rehearing was that the commission has consistently ruled since 480 that this is a prospective remedy. And if it's a prospective remedy, that means it doesn't start until the payments start. And the commission directly responded to those arguments. This is your understanding of what we said in 2008, that we remanded the commission's determination that the remedy would be effective for calendar year 2006 with equalization payments based on 2006. Prior to beginning in 2007, when the commission found that the system agreement rates were unjust and unreasonable on June 1, 2005. So, I mean, we sent it back to the commission. Your Honor, in paragraphs 33 and 34 of the remand order, which is joint appendix 16. Right, that's where I am. The commission discusses how it views what it did here as being consistent with what was done in the remands of the interruptible proceeding. The commission addressed that issue. And the point was that in the interruptible proceeding, it was a monthly calculation. And the unjust and unreasonable finding was in March. And the new calculation was made effective as of April, the next monthly calculation. And because that also was a specific entry into an already existing formula rate, it was a much less complicated procedure than what we're talking about here. Which is another point I would like to make. Because this wasn't raised to the commission, it didn't come up. But you have to also consider how similar this situation would be if we did what the petitioner wants to what this court found we could not do in the City of Anaheim decision that we discussed in our brief. In City of Anaheim, the commission found that a rate was unjust and unreasonable in 2006. It approved the compliance filing setting a new rate in 2007. And this court said, you cannot make the new rate retroactive to the unjust and unreasonable finding. The statute won't permit it. And that's precisely what the petitioner is asking for here. They're asking for, as the petitioner argues, the first compliance filing setting the bandwidth tariff was not approved by the commission until June 9th of 2006. And they're asking... But their argument is in that the rate that should be used is whatever it was, ET26, or the filings that are referred to in Opinion 48, right? They're saying that that should be considered, I guess for lack of a better word, the filed rate. Right, Your Honor. But the problem, as the commission found, is that was never a filed rate. It is, in fact, just two evidentiary exhibits. They're at JA609 and JA614. I invite you to look at them. It took an entire litigated commission proceeding and an appeal to this court to reduce those evidentiary exhibits to a filed tariff, implementing the bandwidth tariff. I mean, it was a very complicated process to get the bandwidth tariff in place. But this court, in an opinion, either these are all running together either earlier this year or late last year, and the Fifth Circuit, have both called that... referred to that as the filed tariff rate, right? And you're calling it the filed tariff rate. Not the original one, not the original one in Opinion 480, but the subsequent. So you're... I guess the implementation of the bandwidth remedy, you are referring to that, and this court has referred to that as a filed rate, correct? The...what has been referred to as the filed rate is the rate that was first accepted by the commission on June 9, 2006, the second compliance filing, April 2007, and then it was affirmed by this court in 2009. That's the filed rate. The ETR 2628 evidentiary exhibits were never the filed rate. What those cases said about... I understand that. I just... I don't want to hijack this argument, but I'm going to need you to explain this to me like I'm an 8-year-old. What is the commission's position with respect then to... if the first filed rate is in June of 2006, you're saying? That's right, Your Honor. What is the commission's position with respect to using that rate to calculate the bandwidth remedy for the time period that precedes it? So June 1 of 2005 to June whatever of 2006. What is your position as to what you're doing there and what the legal justification is to do that? The legal justification, Your Honor, is the fact that this court in the 480 appeal found that it was legal error for the commission to wait until 2006 to implement the remedy. And to correct that legal error, the commission implemented the remedy as of June 1, 2005. And so our legal error gave us the ability to use the only filed tariff that has ever been in place for the bandwidth remedy retroactively as the applicable tariff to calculate those rates. So this is an appropriate exception to the filed rate doctrine. Exactly, Your Honor. It's because of the court remand and our efforts to address the legal error that the court identified. Isn't there tension between that position and referring to this as an insurance policy? Well, no, Your Honor, because the bandwidth remedy is still being implemented the same way. I mean, we're implementing prospectively, but just prospectively now from June 1, 2005 as opposed to January 1, 2006. As the commission said, all they did was move the remedy back seven months to make sure that every production cost disparity that post-dated June 1, 2005 was actually addressed by bandwidth remedy payments. And so it's not a refund? It's not a refund, Your Honor. It's a prospective payment, but the data for one year is accounted for in the payments that are made the subsequent year. How is it a prospective payment? How is that payment that's made to remedy the disparity from June 1, 2005 through June of 2006, how is that a prospective payment? It's a prospective payment, Your Honor, because the way the insurance policy functions is you wait to see whether there are production cost disparities in a particular year. If they are, you calculate, well, you have to wait until the Form 1 in the next year to figure out whether there were production cost disparities. Once you do that, as soon as possible thereafter, there are payments made to address the disparities. And therefore, it's a prospective remedy, but it is addressing cost disparities that occurred in the previous year. It's prospective, but also looking back at the same time? It's a prospective remedy. The payments are made prospectively. But we need a time machine to do that? No, Your Honor, the payments are made prospectively, but they are addressing or accounting for production cost disparities that occurred in the prior year. Okay. My 8-year-old self doesn't really understand that. I guess that's not really a question. I mean, the... We understand that we owe the Commission a lot of deference here, especially in rate making and setting remedies, et cetera. But I guess I would like to make sure that I understand the Commission's position here and how it fits in to the various legal doctrines. And it gets confusing because it doesn't seem that what the Commission is doing at various stages of this litigation and when you compare this litigation to other litigations, that the terminology that it uses is always consistent or that the rationales for paying interest or not paying interest, et cetera, are always consistent. And I'm really sincerely seeking your help with that. Well, on the question, let me again reiterate that all of this argument about that the Commission always applies the formula rate differently and they always apply it to the prior year, this was not made on the hearing and the Commission never had an opportunity to address that in the orders. And that's a jurisdictional bar, the consideration of that argument, and the Commission had no ability to answer it. But with regard to the interest, for example, what the Commission did was originally the request for interest was made because it was a refund. And the Commission said it's not a refund and we're making the payments as soon as possible after the information is known and therefore we don't think interest is appropriate. But later on in subsequent proceedings, the Commission said because there's been such a large delay, the payments weren't actually made promptly afterwards. And so we're going to allow interest to compensate for the extensive delay in these proceedings and people getting their final payments under the bandwidth. And so there's really no... There wasn't any difference in... There were different reasons why the Commission denied the refunds, denied the interest to start off with and why the Commission granted the interest later on, which is just purely how long these proceedings have gone on and how long people have been waiting for their payments when it was intended that they would get their payments promptly following the calculation of the disparities. Do you think the Commission had discretion... I just want to make sure I have this nailed down... discretion to do it the way petitioners wanted? Or do you think you're legally barred from doing that? I don't believe they could have done it the way petitioners want, Your Honor, because of the City of Anaheim issue. Because as of June 1, 2005, there was no bandwidth tariff in place and there wasn't one in place until June 9, 2006. And so City of Anaheim says, just because you find a rate unjust and unreasonable, that doesn't mean you can make the new rate, whenever you approve it, retroactive. In Electrical District 2, which the court relied on, and the City of Anaheim says, in their same situation, the Commission... Because it severs... I mean, it distinguishes refunds from the setting of the rate, right? Right, but Electrical District also said, in that case, too, the Commission tried to make a rate set later on retroactive to its unjust and unreasonable finding, and the court in Electrical District said, the statute doesn't require that. It takes time, just like it takes time for a court to figure out how to manage an injunction. They don't have to put the injunction in place the moment they decide that there's something unlawful going on. They have to figure out what to do, and the same thing is true under the statute. It doesn't mean that as of the date you have an unjust and unreasonable rate. You have to have in hand the replacement rate, and that that replacement rate, what City of Anaheim says, is only in place once it's fixed, prospectively, from that date. And so I don't believe that the Commission could have made this rate effective as of June 1st, 2005, under that precedent. But again, because this wasn't raised when we're hearing, the Commission never addressed these arguments in the orders, but in my view, the Commission legally could not have made this rate effective as of June 1st, 2005. Any further questions? Any further questions? Anything you need to tell us? Nothing. Thank you. Thank you very much, Counsel. Always helpful to the Court. Thank you. Counsel for Intervenor. Good morning. Good morning. May it please the Court. Judge Rogers, you asked, should a remedy have been in effect beginning June 1st, 2005, and thereafter? My response is that a remedy has been provided beginning June 1st and every year thereafter. A remedy has been calculated based on the actual disparities that occurred in 2005 and paid pursuant to the disparities that occurred in 2005. Likewise, for the disparities in 2006, at the end of the year, as soon as the data was available, the disparities were calculated, the differences outside the bandwidth were calculated, and a remedy was provided for 2006. Same for 2007, for 2008. There's been no gap in remedies from 2005 going forward. So just as a practical matter, so I understand, if I in 2005, Louisiana, paid $30 million, and it's determined later that I should have only paid $25 million. That's right. Then in 2006, I would get a payment of $5 million, or I'd get a credit against $10 million. That's correct. Which, is it a payment or a credit? Well, if you paid too much, you'd get a payment. If you didn't pay enough, you'd actually have to make a payment. I mean, if some other party exceeded the bandwidth remedy, you might make a payment. So you can either receive payments or make payments depending on your situation. And indeed, there can be situations where one party is outside the bandwidth. Say, for example, their rates are too high. Everybody else has rates within the bandwidth, even though they're within the bandwidth, they may make payments to the entity outside the bandwidth. But nonetheless, my point is there's never been a period here, a gap where a remedy was not available. The Commission exercised its discretion to choose a methodology where it evaluated whether payments would be needed in a particular year And indeed, this is a remedy where in one year, one client may receive a payment in one company. The next year, a different company may receive a payment. So they chose to wait until the end of each year to see what remedy is required. And then as soon as the data was available, they provided the remedy. Now, Mr. Fontham said he dared us to point to any other rate that works like this rate. And I would say there is another rate that works like this rate. It's in, actually, the Energy System Agreement, Schedule MSS-7. And it was involved in a similar situation where you don't know until the end of the year if their payments will be necessary and so forth. That service agreement dealt with the introduction of energy Gulf states into the system agreement. And some of the companies were concerned that by bringing in Gulf states, it may affect their fuel costs and purchase power costs and their allocation of these costs. So they included this service schedule so that after the fact, at the end of the year, they would go back and determine were these costs affected by the introduction of energy Gulf states. And if so, payments were made to address that issue. Now, it turns out that service schedule was never used because, in fact, payments were never required. But nonetheless, there is a service schedule that operates like an insurance policy in the same energy system agreement. And that service schedule is substantially expired. It had a 10-year duration on it. I actually have no other comments unless you have questions of me. Thank you. Okay, thank you. All right, we'll hear from petitioner. I want to make something very clear. We did not take the position that you have to use the prior year data. As the interveners say in their briefs, they could have had an estimate with a true-up. And that would have provided a remedy right away for what would happen going forward. It just happens to be for practice and the practice in the system agreement that the estimate is the prior year data to set a rate going forward. Now, it just can't be true that the 2007 payments were for 2006. We fought that battle and we lost. We went to FERC and we said, if these 2007 payments are for 2006, we get interest. And that is the only way you can give a full economic remedy to provide interest because there's a delay between the time the rate payers had to pay the cost and the time they give the refund for the prior year. And FERC practice policy regulation says that takes interest. FERC's response based on energy's argument was, oh, no, this is a prospective remedy. And the payments roughly equalized costs going forward. Now they're here, basically have it both ways. Oh, it's prospective, but it's also backwards. But it's only one remedy. It's only one set of payments. It can't go both ways. And the other thing is, if it were a remedy to true up things to a rate that existed in 2006, you wouldn't be able to change it in 2007. You can't change the insurance policy applicable to a prior year loss. You can't change a rate applicable to a prior year loss. You can change a rate going forward. You know, we ‑‑ Council emphasized the Anaheim case. Can you respond to that? Yes, Your Honor. And if we had asked for a refund for 2004, Anaheim would be applicable. But we didn't. We asked for a formula rate going forward. We suggested that they should do it in the same way that they've done system agreement rates forever, using the prior data as the basis to set the prospective rate. And, you know, but you can use estimates. They could go back and right now they could, as of June 1, 2006, put in a remedy based on what actually happened. It wouldn't even need to be an estimate. But they never gave a remedy for 06. They never did. Even on remand they didn't. And by the way, take a look at the order on remand and see if you can find a rationale in there for someone to bring up how rates work and all that sort of thing. There's no rationale in there. But if you want to look in the appendix at 444, you'll see that we very methodically laid out exactly how the system agreement rates have always operated, that the rates started in 1983 based on prior year data. And, you know, that is not retroactive. That is not a problem under Anaheim. Judge Rogers has said when you set formula rates, the formula is the rate, not the data. FERC has said when you set formula rates, the formula is the rate, not the data. There are, you know, we cite a ton of cases in our brief that using prior year data in a formula rate is not retroactive. FERC has held it. This court has held it. I mean, it's just a bogus, totally bogus argument that it would be retroactive to do that. But if they didn't want to do that, they could have put it in based on estimates as the interveners agreed. And the unduly discriminatory rate was paid based on 2004 data in 2005. So, you know, how can it possibly be that you can't fix it? And the other thing, Judge, you know, how can you take $30 million away, $30 plus million away starting May 30, 2007, on a 2006 refund? You can't. What we're saying to you is, yeah, they made this statement in Opinion 480. They changed it in 488. They superchanged it in the compliance orders when they said, this is a going forward remedy, not a remedy for the past. And now we're back here with this order on remand, you know, saying, oh, yeah, 480 gave you a remedy that was effective in 06, which absolutely, categorically never happened. It never happened. So what do you think is the proper characterization of the remedy, just so that I understand? We think that the remedy that they gave us was a prospective formula rate that began on June 1, 2007. Now, what do you think is the proper characterization of the remedy that you want? We want for it to be instructed, as the Federal Power Act instructs it, to set a rate that would be thereafter observed and enforced. The Supreme Court of the United States says a rate is a price paid. They said that on review of that demand response case that came out of this court. And they said they had to define rate was for setting a retail rate or not. And they said a rate is a price paid. It's a sum. It's an amount paid. It's not collection of data. And you can do rate making in any number of ways. You can say, okay, it's $5 a kilowatt. You can set a fixed rate, which is the way it used to be done. But FERC wanted to have automatic changes, automatic adjustment clauses, and the Fifth Circuit approved that. You don't have to file every time the rate changes. But FERC said you're going to have to use FERC Form 1 data in general in those formula rates, which always comes from the prior year. And utilities file a rate, put in the FERC Form 1 data, start collecting the money. And also, Judge, you know, the analogy, you don't know what's going to happen in 2006. It's an insurance policy. Do you know when you set a rate to collect costs what the costs will be in 2006? No. You never do. That's in the future. What you have to do is come up with a method to approximate those costs. So what rate making does is it says, okay, we need a test year. And that test year is usually the most recent test year. And we will use that to say what's likely to happen starting June 1, 2005, and we'll set a rate using that data, and that will, whether it matches up or not, and there are cases on this from the 1980s in this court, whether it matches up or not, the data still served as a proxy for what the actual costs are going forward. There's nothing retroactive about that. But then they chose to use actual costs, and that's already been approved by the court. I mean, that should be safe. Whoa, whoa, whoa. When was that approved by the court? Well, yes, they chose to use actual costs in the system agreement, but when the system agreement went into effect on January 1, 1983, the data in there was 2001 data. So the 2001 data put into the formula. It establishes the rate. First month, Louisiana has to pay. Second month, Louisiana has to pay. Then on June 1, 1983, they switched to the 1982 Form 1 data. That then is replaced into the formula rate. It sets the rate for June, July, August, September. Those were the rates that we were facing in the case. On June 1, 2005, that's how the rate was set. You had formulas. This past cost data was going into those formulas, and it was setting, though, a prospective rate. If you wanted to change the rate, you would only be able to apply it going forward. Now, you know, coming up with this argument, well, if you use the past, that would be retroactive, that was the argument in the interruptible load case in 2000 that you all decided, two of you decided in 2007, that we can't go back and I'm whatever. We can't. That was what they were saying. The court threw that out in two seconds because the court knew you can go back, and when the case went back to FERC, they went back, and they took the loads out of the past data, even though you don't know what the loads will be going forward, and they applied those changed loads to the previous year's costs, and that was what FERC called giving immediate relief. All right. I think we have your argument. Thank you, Your Honor. I appreciate the indulgence. I mean, it is worth explaining, though. I agree. I think. Thank you. We'll take the case under advisement.
judges: Rogers, Kavanaugh, Wilkins